**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **RALPH JACKSON,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **TEAMSTERS LOCAL UNION 922,** *et al.*, <br><br> **Defendants.** | Civil Action No. 12-2065 (JEB) |

**MEMORANDUM OPINION**

As any buyer of a new car knows, driving off the lot typically triggers a feeling of buyer's remorse. In other words, once we know there is an opportunity lost by a decision we make, we often feel post-decision regret. Plaintiffs, eight former employees of Giant Food, LLC, who have brought a "hybrid" claim under the Labor Management Relations Act alleging wrongdoing by both Giant and their Unions, appear to suffer from a serious case of buyer's remorse with regard to the severance package they accepted when the grocery-store company laid them off. They insist that had they known that their decision to opt for severance pay meant they forfeited the right to be placed on a recall list, which might have afforded them an opportunity to be rehired within six months of their termination, they would not have accepted such payments. Giant maintains that the choice posed by the severance package was clear, and that Plaintiffs are precluded from suing the company by the releases they signed.

In bringing this suit, Plaintiffs contend that they are not bound by such releases because Giant only induced them to sign through material misrepresentations. As causes of action, they allege that the two Unions of which they were members, Local 730 and Local 922, failed to

1

adequately discharge their duty of fair representation in negotiating the terms of the severance and release, and that Giant's termination of them and subsequent recall of other employees violated its collective-bargaining agreements with the Unions. In an earlier Opinion, the Court ruled that these two claims are interrelated, constituting one "hybrid" claim against both Giant and the Unions, all three of whom are Defendants in this suit.

Defendants reject Plaintiffs' narrative and, asserting that the material facts at issue are undisputed, have separately moved for summary judgment. Concluding that Giant made no material misrepresentations related to Plaintiffs' release agreements and that their waiver of claims is therefore valid, the Court will grant the company's Motion. In addition, as Plaintiffs' hybrid claim is deficient, the Court will also grant the Unions' Motion, putting an end to this long-running conflict arising from Plaintiffs' choice.

## I.      Background

While the Court well knows that facts on summary judgment should be considered in the light most favorable to the non-movant, it also notes that, pursuant to Federal Rule of Civil Procedure 56(c), parties "asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record," and the Court "need consider only the cited materials, [though] it may consider others in the record." Fed. R. Civ. P. 56(c)(1)(A), (c)(3). In this case, Defendants have submitted a 54-page Joint Statement of Facts, Plaintiffs have responded with a 137-page Response, and both sides have each submitted more than 60 exhibits. See Def. JSOF (ECF No. 130-7); Pl. Resp. to JSOF (ECF No. 141-1). Plaintiffs' filings, in addition to being voluminous, are riddled with typographical errors and incomplete sentences, frequently confuse argument with fact, and often fail to identify precise record citations to support their claims. It is not the Court's duty to mine the record for every

relevant evidentiary item.  See Potter v. District of Columbia,  558 F.3d 542, 553 (D.C. Cir. 2009) (Williams,  J., concurring).  Where "a party fails to properly  support an assertion of fact or fails to properly  address another party's assertion of fact . . . , the court may . . . consider the fact undisputed."  Fed. R. Civ. P. 56(e)(1); see also LCvR 7(h)(1) (explaining  that Court may assume that nonmoving  party "admitted" facts it failed to "controvert"  in its response or opposition).  In other words, the Court will decline the invitation  to fill in the literal blanks left by Plaintiffs' briefing.  See, e.g., Pl. Resp. to JSOF, ¶ 104 ("Plaintiffs  further incorporate  by reference their responses in response to Defendants allegations  in paragraphs , as if fully pled herein."), ¶ 130 ("See Ex____").  With these principles  in mind, the Court recites the facts relevant to its disposition  of Defendants' Motions  for Summary Judgment.

   A.  Parties and Setting

   Plaintiffs  in this case are eight former employees of Giant,  which operates a chain of grocery stores located in Maryland, Virginia,  Delaware, and the District of Columbia.  See Pl. Resp. to JSOF, ¶ 1.  While employed by Giant,  Plaintiffs  were members of one of two unions, Local 922 or Local 730 ("the Unions").  Id., ¶ 2.  Until 2011, Giant's retail stores were supported by two distribution  centers located in Jessup, Maryland:  one for "fresh" groceries and the other for "dry" groceries.  Id., ¶ 6.  The fresh-foods center, including  a recycling facility, was operated entirely by Giant, but the dry-goods  compound  was only partially  operated by Giant; the dry-goods recycling facility was run by the company, but the dry-goods  warehouse was run by a subsidiary of C&S Wholesale Company.  Id., ¶¶ 7-8, 15.  All of the Plaintiffs  worked at one of the two recycling facilities.  Id., ¶ 9.

   In previous  years, Giant had operated a variety of facilities  in support of its stores – including  its own dairy, bakery, and the like – but at the time of the events at issue, the company

was focused more on the operation of its retail grocery stores and, in streamlining its operations, reallocated or laid off workers. Id., ¶ 16. In addition, in June 2012, C&S closed the dry-goods warehouse it operated in Jessup, Maryland, and relocated those operations to Pennsylvania, leading to a number of layoffs, including some members of Local 730. Id., ¶ 19. The parties agree that Giant learned of that planned closure in April 2012 and made some efforts to prepare for those layoffs, though they dispute precisely what actions were taken and when, id., ¶¶ 20-24; those disputes, however, are irrelevant to Defendants' Motions.

In a memorandum dated April 26, 2012, and addressed to the entire Giant Distribution Team, Giant's Vice President of Distribution Operations, Mike Scott, informed the Team of the dry-goods-warehouse closure and indicated that "Giant was still assessing the impact of C&S's decision." Id., ¶ 26. This memorandum was posted in some employee break rooms. Id. Giant ultimately concluded that, after the C&S closure, "it would be more efficient to operate only one recycling facility instead of two." Id., ¶ 29 (citing Def. Exh. 12 (ECF No. 132-2) (Deposition of Billye Pounds, Giant Senior Manager of Human Resources) at 46:3-16). Because "multiple people" had been doing the "same work" at the two separate facilities, Giant expected that after their consolidation, it would not require as many employees. See id., ¶ 32; Pounds Dep. at 55:10-56:10. The parties disagree about how Giant arrived at that expectation, whether its belief in the reduced need for employees was reasonable, and other such details, but Plaintiffs point to no testimony indicating that Giant did not "believe that the consolidation of the two warehouses would . . . mean that there was going to be less work for employees to do." Pounds Dep. at 55:13-15.

B.  Negotiation and Termination

In late May and early June of 2012, Giant met with the leaders of Local 730 and Local 922 to discuss the effects of the facilities' consolidation – what the parties refer to as "effects bargaining."  See Pl. Resp. to JSOF, ¶¶ 34-46.  Ritchie Brooks, President of Local 730, and Ferline Buie, President of Local 922, agreed that the two Unions would jointly negotiate with Giant during the effects bargaining.  Id., ¶¶ 39, 46.  At least one meeting between Buie and Giant was attended by five of the Plaintiffs.  Id., ¶ 43.

The Unions sought to convince Giant that the layoffs were not necessary, the number of laid-off employees should be fewer than the company's predictions, and Giant should engage in a $50,000 voluntary buyout.  Id., ¶¶ 49-51.  The Unions succeeded in bargaining down the number of laid-off employees but not on their other demands. Id., ¶ 50.  The Unions then requested severance pay for the affected employees or, in the alternative, "recall rights," meaning the right to be placed on a list for potential rehire, based on seniority, following termination of employment.  Id., ¶ 51.  As to severance, the Unions asked Giant to provide two weeks of severance pay for each year of employment with the company, but Giant agreed to only one week per year of service.  Id., ¶ 52.  As to recall, the Unions asked that those employees who decided not to accept the severance package would have recall rights for one year.  Id., ¶ 53. Giant and the Unions disputed whether each Union's Collective Bargaining Agreement with the Company already gave Union members recall rights, and Plaintiffs and Defendants continue to dispute what the CBAs required.  Id., ¶¶ 54-57.

Ultimately, the Unions and Giant agreed to a severance package under which affected employees would have the option either to receive up to eight weeks of severance pay, depending on their years of service but with a minimum of two weeks' pay, or instead to be placed on the

recall list for six months. Id., ¶ 58. If they chose the latter option, they would still lose their jobs, but would be eligible for rehire if Giant recalled any employees. The company agreed to reduce its number of layoffs to eight employees from Local 730 and twelve employees from Local 922. Id., ¶ 81. This agreement was later memorialized in two Memoranda of Understanding. See Def. Exh. 33 (ECF No. 133-13) (Local 922 MOU), 34 (ECF No. 133-14) (Local 730 MOU).

During the effects bargaining, leadership of Local 730 and Local 922 had requested that the Unions, rather than Giant, be permitted to inform their members about the layoff, and Giant acquiesced. Id., ¶ 62; see also Def. Exh. 1 (ECF No. 131-1) (Deposition of Michael Scott, Giant Director of Warehousing) at 112:6-9. The Unions held these meetings from the beginning to the middle of June 2012. Id., ¶¶ 63-64. What was and was not said at those meetings is the source of some dispute, but the parties agree that representatives from Giant's Human Resources department and Distribution Services division attended, id., ¶ 64, and that Union members were informed about the impending layoffs and severance package that had been negotiated on their behalf with Giant. Id., ¶¶ 65, 74. The parties do not agree whether the Union leaders told Union members that, should they choose to decline the severance package, they would be placed on a recall list for up to six months. Id. In addition, information was provided to the employees who would be laid off to help them find new employment. Id., ¶ 67.

At the request of Union leaders, Kelli Hall, Giant's Human Resources Manager, or her associate met individually with each of the twenty affected employees for approximately ten minutes each and provided them with copies of the Separation and Release Agreement they would need to sign if they chose to receive severance pay. Id., ¶¶ 87-90. Although Plaintiffs maintain that they did not understand the terms of the Agreement, Hall maintains that she read

the separate Acknowledgement of Receipt of Separation and Release Agreement out loud to each of them and gave them copies of both documents, informed them that they had forty-five days in which to determine whether or not to sign it, encouraged them to consult with an attorney before signing it, and explained that, as required by the Older Workers Benefit Protection Act of 1990, employees had seven days after signing the Agreement in which to revoke it. Id., ¶ 92. She states that she explained that they would receive the severance pay within two weeks if they decided to sign the Agreement. Id. After meeting with Hall, all Plaintiffs then signed the Acknowledgement, which set forth in writing this information. See Declaration of Kelli Hall, Exh. 1 (ECF No. 130-4) (Plaintiffs' Signed Acknowledgements). The Acknowledgement also explained that the terminations had been determined pursuant to the seniority process in the Collective Bargaining Agreements and that employees should not sign and return the Agreement any earlier than three days before their last day of work. Id.

The Agreement itself contained two provisions of special relevance to this litigation. The first is a paragraph entitled "Rehire" telling employees that by signing the Agreement, they "hereby agree not to knowingly seek or accept employment, whether directly or indirectly, with the Company . . . or any of its operating companies or affiliates. You further agree that your execution of this Agreement is good and sufficient cause for the Company and/or its affiliates to reject any application you may make for employment or re-employment." Def. Exh. 2 (ECF No. 130-5) (Plaintiffs' Signed Agreements), ¶ 10. The second is a "Complete Release of Claims" paragraph explaining that employees

> fully release, waive and forever discharge the Company . . . from any and all administrative claims, actions, suits, . . . or liabilities of any nature . . . , whether known or unknown, arising prior to the Effective Date of this Agreement, including, but not limited to . . . all claims arising in law or equity or any claims arising under [a variety of federal and state statutory and common-law causes of

> action] . . . .  You expressly agree and understand that this General
> Release means that you are releasing the Released Parties from all
> claims, whether known or unknown, . . . and whether or not the
> claims arise out of your employment with or termination of
> employment from the Company . . . .

Id., ¶ 3; see also id., ¶ 4 ("Pursuit of Released Claims").

All of the Plaintiffs signed the Agreements.  Id.  They agree that they had the opportunity

to review the Agreement prior to signing it, though they maintain that they did not understand all

of it.  See Pl. Resp. to JSOF, ¶ 110.  Only one of the twenty laid-off employees opted not to sign

the Agreement.  Id., ¶ 108; see also Hall Decl., ¶ 17 (explaining that Frank Manieri told her he

wanted to be placed on the recall list, and she told him that he should not sign the Agreement if

he wanted to preserve the option of being recalled).  The parties do not agree about what, if any,

advice the Unions gave the employees about whether to sign the Agreements.  See, e.g., Pl. Resp.

to JSOF, ¶¶ 111-12.  No Plaintiff revoked or attempted to revoke her Agreement within seven

days of signing it, and all Plaintiffs received their severance payments in accordance with the

terms of their Agreements.  Id., ¶¶ 114-15.

On June 29, 2012, a massive storm known as a "derecho" hit the Washington

metropolitan area, resulting in the loss of power to more than seventy of Giant's stores in the

region.  Id., ¶ 119.  While the parties disagree about the impact of the storm on the Jessup

facility's operations, id., ¶¶ 120-21, it is undisputed that Giant chose to recall – first on a

temporary basis and then permanently – three employees on July 4 and then hired twelve

additional temporary employees in the days afterward.  Id., ¶¶ 123-25.  Plaintiffs maintain that

Giant knew or should have known that the July 4th period would be a busy time, requiring

additional workers, but Giant insists that it had no plans to recall or hire new workers prior to the

derecho.  Id., ¶¶ 123-26.  Neither the eight Plaintiffs nor any of the other employees who signed the Agreements were among the recalled employees.  Id., ¶ 127.

    C.  Grievances, NLRB Charge, and Litigation

    In early July, Plaintiffs learned of some recalls.  Id., ¶ 128.  On August 16, 2012, members of Local 730, including Plaintiffs Tiffany Cherry, Christopher Mundell, and Sharron Foster, filed a "group grievance" with their Union complaining that their layoffs violated the Local 730 CBA.  Id., ¶ 137.  On the same day, members of Local 922, including Plaintiffs Donna Ward, Donchez Coates, Linda Mathis, William Christopher, and Ralph Jackson, also filed a "group grievance" with their Union raising the same complaint with regard to their CBA.  Id., ¶ 138.  A joint letter from both Unions was also sent on Plaintiffs' behalf to Giant's Human Resources department, accusing the company of improperly laying off Plaintiffs and requesting that the Company meet with them to resolve the grievance.  Id., ¶ 139.  The parties "vigorously" dispute whether the grievances filed against the Unions were timely and whether they were handled properly by the Unions, see, e.g., id., ¶ 144, but neither Union processed the grievance to arbitration.  Id., ¶¶ 146, 149.  After receiving the grievances from the Unions, Giant denied the grievance of the Local 730 Plaintiffs by letter dated August 26, 2012, and the Local 922 Plaintiffs' grievance by letter dated August 29, 2012.  Id., ¶¶ 144-48.

    On November 17, 2012, those Plaintiffs, through counsel, together filed three unfair-labor-practice charges with the National Labor Relations Board: one each against the Unions and one against Giant.  Id., ¶ 152; see also Def. Exh. 45-46 (ECF No. 134-5, -6) (NLRB Charges).  In their charges against the Unions, Plaintiffs claimed that Local 730 and Local 922 breached their duty of fair representation vis-à-vis their termination and severance package; in their charge against Giant, Plaintiffs claimed the company "unlawfully" terminated their employment by

inducing them through threats and coercion to sign the Separation and Release Agreements.  See Pl. Resp. to JSOF, ¶¶ 153-154.  The NLRB Regional Office then conducted an investigation into the charges, id., ¶ 156, which included interviewing six of the eight Plaintiffs.  Id., ¶ 157.

By letters dated January 31, 2013, the NLRB Regional Director, Wayne Gold, dismissed the charges against the Unions.  See Def. Exh. 56-57 (ECF No. 134-16, -17) (Letters Dismissing Local 730 & Local 922 Charges) ("The investigation failed to reveal any evidence that employees were coerced into signing severance agreements.  Rather, the evidence established that the Union simply informed employees of their options regarding severance.").  Gold similarly dismissed the charge against Giant on the same day.  See Def. Exh. 55 (ECF No. 134-15) (Letter Dismissing Giant Charge) ("The evidence obtained during the investigation established the Employer notified the employees' collective-bargaining representative of its decision to conduct the layoff.  The Employer then bargained over the effects of the layoff with [that] representative.  The employees were selected for layoff by order of seniority; and, they were provided with two options, (1) sign a severance agreement and waive . . . recall rights or (2) accept six months of recall rights. . . . Your allegation that the employees were threatened and coerced into signing the agreements also lacks evidentiary support.").

Plaintiffs, unsurprisingly, appealed the Regional Director's dismissals to the NLRB's Office of Appeals.  See Declaration of Ritchie Brooks, Exh. 8 (ECF No. 134-18) (Feb. 19, 2013, NLRB Appeal Acknowledgment) at 1.  On April 17, 2013, the NLRB Office of Appeals affirmed the Regional Director's dismissals of Plaintiffs' three charges, "substantially for the reasons in the Regional Director's letters of January 31, 2013."  Id. at 3 (Apr. 17, 2013, NLRB Denial Letter).

Shortly after Plaintiffs filed their NLRB Charges – but before those charges could be adjudicated – they filed suit in this Court against Giant and the Unions. See Complaint (ECF No. 1) (filed Dec. 27, 2012). The Complaint asserted six causes of action and sought monetary damages to compensate for lost wages, benefits, and emotional distress; reinstatement to their positions at Giant; attorney fees and costs; pre-judgment interest; and punitive damages. Id. at 7-16. With leave of court, Plaintiffs subsequently filed a 68-page Amended Complaint that asserted eight causes of action: breach of the duty of fair representation by the Unions (Counts I and II) and six counts against Giant, including breach of contract (Count III), "misrepresentation" (Count IV), fraud and constructive fraud (Counts V and VI), "detrimental reliance" (Count VII), and retaliation (Count VIII). See Amended Complaint (ECF No. 39). Defendants then moved to dismiss the Amended Complaint and alternatively sought summary judgment. See ECF Nos. 40-42.

On February 12, 2014, this Court issued an Order granting in part and denying in part Defendants' motions. See ECF No. 53. In an accompanying Memorandum Opinion, the Court dismissed all of Plaintiffs' claims against Giant except for one: breach of contract. Jackson v. Teamsters Local Union 922, 991 F. Supp. 2d 71, 86 (D.D.C. 2014). It further concluded that the breach-of-contract cause of action was in fact only viable as a claim under section 301 of the Labor Management Relations Act, and so should proceed under that statute. Id. at 81. The Court also held that it was premature to enforce the waiver of claims against Giant in the Separation and Release Agreements given that discovery had not yet fully fleshed out the circumstances surrounding those releases. Id. at 82-83.

The Court then examined Plaintiffs' § 301 claim against Giant and their breach-of-duty-of-fair-representation claims against the Unions and concluded that these did not stand alone, but

were, in fact, pled as a "hybrid section-301/fair-representation suit against both Giant and their Unions." Id. at 81. As this hybrid claim was sufficiently pled to defeat a motion to dismiss, the Court permitted that sole cause of action to proceed against all three Defendants. Id.

The parties next traveled through the discovery phase, during which they had a number of substantial disagreements over deposition testimony and expert witnesses. See Jackson v. Teamsters Local Union 922, 310 F.R.D. 179 (D.D.C. 2015) (striking portions of employees' errata sheets that made substantive changes or contradictions to prior deposition testimony); Jackson v. Teamsters Local Union 922, No. 12-2065, 2015 WL 11023790 (D.D.C. Oct. 26, 2015) (denying Plaintiffs' motion to reconsider Court's prior ruling on errata sheets); Jackson v. Teamsters Local Union 922, 312 F.R.D. 235 (D.D.C. 2015) (denying Plaintiffs' motion for leave to supplement expert reports). Eventually, Defendants each moved for summary judgment. See ECF Nos. 128 (Local 922 MSJ), 129 (Local 730 MSJ), 130 (Giant MSJ). Those Motions are now ripe.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

III.   **Analysis**

Plaintiffs' "hybrid" section-301/fair-representation claim is composed of two parts: A claim against Giant for breach of its collective-bargaining agreements (CBA) and a claim against the Unions for breach of their duty of fair representation. See Cephas v. MVM, Inc., 520 F.3d 480, 485 (D.C. Cir. 2008) (citing DelCostello v. Int'l Bhd. Of Teamsters, 462 U.S. 151, 164-65 & n.14 (1983)). Because these components are "intertwined," Jackson I, 991 F. Supp. 2d at 81, Plaintiffs must succeed on both in order to prevail.

In seeking summary judgment, Giant first contends that by signing Separation and Release Agreements, Plaintiffs have expressly waived their right to assert that the company violated the CBAs. Should its waiver argument fail to persuade, Giant also maintains that it did not breach the CBAs and that the Unions did not breach their duty of fair representation. The Unions similarly argue that Plaintiffs cannot succeed on either prong of their hybrid claim.

The Court first finds that the Agreements are valid and thus release Giant from all claims Plaintiffs raise against the company. It next turns to the question of whether, as Plaintiffs assert, they may nevertheless bring a stand-alone claim against the Unions and the viability of such a claim.

A. Waiver of Claims Against Giant

Giant's first line of defense is its waiver argument: It insists that Plaintiffs waived their right to bring any claim relating to their termination of employment with Giant, including any breach-of-CBA or hybrid claim, when they signed their Separation and Release Agreements with the company in June 2012.

The Agreements, offered to employees "considered for separation pursuant to the number of positions available and the seniority process established in the Collective Bargaining Agreements," Acknowledgements at 1, required that employees, in exchange for severance pay, "fully release, waive, and forever discharge the Company, [and] all affiliated or related companies . . . from any and all administrative claims, actions, suits, debts, demands, damages, claims, judgments, or liabilities of any nature, including costs and attorneys' fees, whether known or unknown, arising prior to the Effective Date of this Agreement." Agreement, ¶ 3. The Agreement expressly noted that this "General Release" applied "whether or not the claims ar[o]se out of your employment with or termination of employment from" Giant. Id.

These terms, Giant insists, clearly cover the breach-of-CBA claim, which is based on the company's layoffs and recalls that Plaintiffs believe violated the CBA. The Agreements were signed on June 28 or 29, 2012, depending on the Plaintiff, and their effective dates were eight days after Plaintiffs signed them. See id., ¶ 12(g). As the layoffs occurred on June 30, 2012, see id., ¶ 1, predating the effective dates of the Agreements, Defendants believe any breach claims are waived. Plaintiffs do not dispute that if the waivers are valid, they are out of luck with respect to their suit against Giant. Instead, they rejoin that they were induced to sign the Agreements by the company's material misrepresentations and omissions and that, accordingly, the Agreements should be deemed void and unenforceable. See Opp. (ECF No. 141) at 39-40.

The Agreement includes a choice-of-law provision instructing that it "shall be governed by the laws of the State of Maryland." Agreement, ¶ 14. The parties agree that under Maryland law, a release is a contract. See Owens-Ill., Inc. v. Cook, 872 A.2d 969, 985 (Md. 2005); Parish v. Md. & Va. Milk Producers Ass'n, 242 A.2d 512, 555 (Md. 1968). As such, the construction and interpretation of this release is governed by the Maryland law of contracts, "the cardinal rule" of which "is to effectuate the intentions of the parties." Cook, 872 A.2d at 985.

As the Court noted in its earlier Opinion, see Jackson I, 991 F. Supp. 2d at 84, a contract is voidable under Maryland law if signed in reliance upon a misrepresentation of material fact by a counter-party. See Snyder v. Herbert Greenbaum & Assocs., Inc., 380 A.2d 618, 621 (Md. Ct. Spec. App. 1977); see also Restatement (Second) of Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."). Once a misrepresentation has been established, the question before the Court is "whether the extraordinary powers of equity may be invoked to rescind the executed contract

because one or more of the misrepresentations – which the [Plaintiffs] claim they relied on – induced them to enter into the contract." Wolin v. Zenith Homes, Inc., 146 A.2d 197, 200 (Md. 1959).

Plaintiffs here contend that the Agreement's waiver is unenforceable at this stage of the litigation because there remain genuine issues of material fact

> as to whether Giant misrepresented (1) the terms of the separation agreement – which insists [sic] included the option to choose the opportunity to be placed on a six-month recall list over severance pay – (2) the lack of available work, and (3) the slim chance of a recall, (4) there were going to be future layoffs, (5) that it [sic] was not enough room or equipment for all the employees[,] (6) the recycling building was shutting down, ([7]) the laid off members['] jobs were gone and they would not be replaced and ([8]) "Giant do not want you anymore."

Opp. at 40.

Defendants rejoin, first, that all of these purported representations, even if they are false or misstatements, are not material to the Agreement, and second, that the record establishes that Giant never actually misrepresented anything to Plaintiffs in connection with the Agreement. See Giant Reply (ECF No. 158) at 6-14. The Court addresses each of these responses in turn, rejecting the first but accepting the second.

### 1. Materiality

As to the first issue, it is certainly true that only a "misrepresentation of material fact by a counter-party," if relied on by another party, can render the resulting contract voidable or merit rescission. See Jackson I, 991 F. Supp. 2d at 82. The Court of Appeals of Maryland has explained that typically "reliance upon a misrepresentation of fact, intentionally misrepresented or otherwise, is justifiable only if the fact misrepresented is material. A fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in

determining his choice of action in the transaction, or the maker of the misrepresentation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it." Carozza v. Peacock Land Corp., 188 A.2d 917, 921 (Md. 1963). Particularly where "the misrepresentation is made without scienter or fraudulent intent, the element of materiality must be clearly established. Needless to say, the materiality of a misrepresentation turns on the facts of the particular case." Chesapeake Homes, Inc. v. McGrath, 240 A.2d 245, 250 (Md. 1968) (citation omitted); see also, e.g., id. (holding, on those facts, that "what makes the representation [regarding the identity of the property purchased] material is not the frequency and confidence with which the assurances were made, but the knowledge on the part of the appellants that the appellees both desired and expected to receive" something under the contract that they did not "actually receive[]" and without which they "would have been unwilling" to enter into the contract); Telma v. Gingell, 146 A. 221, 221 (Md. 1929) (vendor's representation that first floor of building was rented to responsible tenant for five-year term was material misrepresentation on which purchaser might rely in deciding to sign contract for sale of the property).

Importantly, "[a] representation which merely amounts to a statement of opinion, judgment, or expectation, or is vague and indefinite in its nature and terms, or is merely a loose, conjectural or exaggerated statement, is not sufficient to support an action" for rescission. Hall v. Brown, 94 A. 530, 531 (Md. 1915) (quoting Buschman v. Codd, 52 Md. 202, 207 (1879)); see also id. ("[P]rovided the statement is material and is not the mere expression of opinion, and provided the purchaser relies upon it and is deceived, and the statement concerns a matter which cannot be discovered by ordinary observation, . . . [e]ven an innocent misrepresentation . . . may avoid the contract.") (quotation marks and citation omitted).

Keeping this standard in mind, the Court believes that the series of "misrepresentations" Plaintiffs have listed really all go to two separate issues. First, did Giant misrepresent or not inform Plaintiffs that they had two alternatives – namely, obtain severance or remain on the recall list? Second, even if it explained these options, did Giant misrepresent that the likelihood of a recall was slim? Both of these issues could be considered material because an employee would want to know her options before signing the Agreement and because the likelihood of a recall could well dictate her decision between those options. The Court thus next looks at each to see whether a jury could conclude that Giant made such representations and whether they were in fact false.

### 2. *Misrepresentation re: Severance-vs.-Recall Choice*

In response to Plaintiffs' position that Giant misrepresented their choice between receiving the severance payment and being placed on the recall list, the company offers two primary counterarguments. First, the Agreement is clear inasmuch as it includes a provision expressly disavowing Plaintiffs' rights to rehire. Second, Plaintiffs' contention that Giant never told them about the recall-list alternative fails because the undisputed evidence reveals that they had actual knowledge of their options.

### a. Terms of the Agreement

Giant begins with the terms of the Agreement, which, it maintains, are unambiguous. The Agreement includes a "Rehire" provision, which states that, by signing the document, employees "hereby agree not to knowingly seek or accept employment, whether directly or indirectly, with the Company, [Giant], or any of its operating companies or affiliates. You further agree that your execution of this Agreement is good and sufficient cause for the Company and/or its affiliates to reject any application you make for employment <u>or reemployment</u>." Agreement,

¶ 10 (emphasis added).  Plaintiffs assert that "instructing [employees] that they cannot be rehired is not the same as telling them that they cannot be recalled following a layoff," Opp. at 45, but the provision's express inclusion of both employment and reemployment demonstrates that "Rehire" was meant to include recalls.  See EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1069 n.4 (11th Cir. 1990) ("The distinction drawn by the Company and adopted by the trial court between 'recall' and 'rehire' is at most legal fiction.  We do not adopt this fiction.").  In any event, Plaintiffs also agreed not to "accept employment" with Giant.  The Agreement is pellucid, then, that the employees who sign may not be recalled or otherwise seek or accept employment with Giant in the future.

### b.  Omission of Recall-List Option

Instead of focusing on the terms of the Agreement, Plaintiffs principally argue that Giant omitted to tell them about the alternative to signing the Agreement – namely, the six-month recall list – which is not explicitly set forth in the Agreement.  There are three difficulties with Plaintiffs' position.  First, although the recall option was not discussed in the Agreement, Plaintiffs knew that by signing they would not be recalled.  This was the thrust of section (a), supra.  Second, as explained below in subsection (i), the record demonstrates that Plaintiffs did actually know about the recall option.  Finally, as subsection (ii), infra, makes clear, it is undisputed that Giant clearly told Plaintiffs' representatives – i.e., the Unions – about the two choices.

### i.  Plaintiffs' Personal Knowledge

Plaintiffs' position that they did not understand the alternative to signing the Agreement lacks concrete factual support in the record. Most specifically, their Opposition identifies only

one Plaintiff's deposition that backs up their assertion that Plaintiffs "were not advised of the option to be placed on the six month recall list." Opp. at 43.

Plaintiff Sharron Foster, a member of Local 730, testified that, at the meeting "for the people that was being laid off," a representative from Giant's management was present, as was Ritchie Brooks, President of Local 730, who had participated in the "effects bargaining" with Giant on behalf of Local 730. See Pl. Exh. 18 (ECF No. 144-1) (Deposition of Sharron Foster) at 91:1-6. The Giant representative explained to the employees how they would "be getting paid for our severance pay, [based on] the years of service that [they] put in," and that they would be receiving "the separation agreement." Id. at 92:12-19. Some employees asked questions, but Foster stated that she could not recall either those questions or the answers Giant gave to them; she testified that she "can't recall" whether anyone asked about a recall. See 99:3-9. Foster could not state with certainty that the employees were not advised, at that meeting, of the option to be placed on the six-month recall list if they opted out of the severance pay and chose not to sign the Agreement. Instead, she testified only that the Giant representative did not state whether there would actually be a recall or not – i.e., whether Giant would, in fact, need to recall employees whose names were on the six-month recall list:

> Q: . . . In June of 2012 [when you signed the Severance and Release Agreement] did you know whether or not you had any re-call rights in your Collective Bargaining Agreement?
> A: No.
> Q: You didn't know one way or the other?
> A: That I knew I have re-call, no. Not at that time, no, I didn't.
> Q: Okay. At the time did you know what re-call rights were?
> A: Did I know what they were. You're asking me do I know what it mean?
> Q: At the time did you know what it meant?
> A: Re-call means I could be re-called to come back – to work if needed for me to be re-called.

Q: But you didn't know whether you had a right to that or not?

A: No, I didn't.  I wasn't told that I had a re-call right.

Q: And did you ask anybody?

A: At that time?

Q: Yes.

A: Well, in the break room they said – they didn't mention anything about a re-call.

Q: Okay.

A: That I can recall.  I can't –

Q: One way or the other?

A: I wasn't re-called.

Q: Say that again.

A: I mean, you said one way or the other.  I said I wasn't re-called.

Q: No, I'm saying at that meeting did he say anything one way or the other about whether there would be a re-call?

A: No, because he said it wasn't going to be no more work for us for a re-call, so, no. . . .

Q: But did he say anything about a re-call?

A: He didn't tell us that there would be a re-call.  No, he didn't.

Q: Did he tell you there would not be a re-call?

A: He didn't tell us that there would be a re-call.

Q: My question was, did he tell you there would not be a re-call?

A: He didn't tell us that it would be a recall; because if he told us that there would be a re-call, I wouldn't have signed that form.

Q: I understand.  Maybe I'm not being clear.  You said he didn't say there would be a re-call, right?

A: He didn't mention anything about a re-call.

. . .

Q: Did anybody ask if there was a re-call?

A: I can't recall.  It was questions.  I can't recall exactly whether somebody asked whether there was going to be a re-call or not.

Q: Did he talk about the possibility of a re-call?

A: No.

Id. at 96:7-99.  This confused colloquy is hardly enough to raise the specter of misrepresentation or omission by Giant, yet Plaintiffs ask the Court to conclude, based on this alone, that Plaintiffs were not aware that they were signing away their recall rights when they agreed to accept

severance pay.  Foster's testimony, however, is not enough to create a dispute of material fact, particularly given the countervailing evidence in the record.

To begin, Defendants point the Court to the deposition of Ferline Buie, President of Local 922, in which she testified that she had a meeting with Union members on June 5, 2012, to discuss the information she had been given from Giant's representatives during the "effects bargaining" process.  See Pl. Exh. 22 (ECF No. 144-5) (Deposition of Ferline Buie) at 26:1-11. Buie testified that, although she did not officially take attendance at the meeting, "[i]t seems that everybody [from the Union] was there because I had the meeting at a time wherein the shift crossed over.  In other words, the a.m. people would be getting off and the p.m. people would be coming in.  So all of them would be right there together. . . . [including the members who worked on the third, night shift who] were there." Id. at 26:18-27:7.  There, she said, "I think somebody asked me should they sign the severance package.  And I said to them, I can't tell you to sign it. I can't tell you not to sign it because I don't know your condition.  But what I will tell you is that if you sign it you will not be eligible for a recall." Id. at 41:2-7.  This suggests that the Unions, contrary to Plaintiffs' suggestion, never sought to hide the ball as to the Agreement and its effect.

Similarly, the record indicates that Giant made substantial efforts to familiarize Plaintiffs with the Agreement and its terms.  Kelli Hall, Human Resources Manager for Giant, stated that she "met with the associates" to be terminated "on an individual basis, with each meeting lasting approximately ten minutes.  The associates were informed that, if they signed the Separation and Release Agreement, then they would receive severance pay based on their length of service with the Company, but if the associate declined to sign the Separation Agreement then he or she would be eligible to be placed on the recall list for potential rehire." Hall Declaration, ¶ 7.

This testimony is bolstered by the sworn affidavit of Plaintiff Donchez Coates, a member of Local 922 who signed the Agreement. See Def. Exh. 25 (ECF No. 133-5) (Affidavit of Donchez Coates). Coates recalled the meeting with Buie at which she explained that some of the members of Local 922 would be laid off. Id. at 4. Later, he stated, "There was a Giant meeting run by human resources . . . for the people who were being let go." Id. at 5. The meeting was run by "Kell[i] Hall and another lady from human resources," and afterward Hall spoke individually with each employee about the severance package. Id. During his conversation with Hall, Coates had the following exchange:

> When I went in the hallway with Kell[i] she went over some forms with me. She told me that if I took a severance package, I would lose the opportunity to be called back to work within six months. I asked if there was a guarantee that I would be called back. She said no. I asked if I don't take the severance package, then I won't get the money, but I could be called back. . . . I wasn't allowed to give her the signed severance agreement because she told me to take it home and let someone else look at it. I had to wait three days to give her back the signed severance agreement. I gave Kell[i] the signed severance agreement after the three days.

Id. Giant points to Coates's affidavit in support of the proposition that the Company did explain to members of the Unions that, among the various consequences of signing the severance agreement was the inability to be included on a six-month recall list. See Giant Reply at 9. Indeed, Plaintiffs agree that Coates, and four other Plaintiffs, even attended a meeting with Giant representatives on June 5, 2012, during the effects bargaining, in which the impending layoffs, the separation agreement, and the employees' recall rights were discussed. See Pl. Resp. to JSOF, ¶ 43.

At the end of the day, Foster's equivocal testimony is the only evidence in the record that Plaintiffs cite in support of the notion that they did not know they would opt out of being on a recall list by signing the Agreement. See Fed. R. Civ. P. 56(c)(3) (court "need consider only the

cited materials"). This is simply not enough to defeat summary judgment. "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48. The material question here is whether Giant failed to mention the recall option, and nothing Plaintiffs have proffered creates a genuine dispute as to that.

ii.      Plaintiffs' Knowledge Through Unions

Even if the above evidence were insufficiently clear, Plaintiffs cannot dispute that their <u>representatives</u> (the Unions) were expressly told of the recall option. Indeed, it appears in the Memorandum of Understanding Giant signed with each of the Unions on June 18, 2012. Those MOUs memorialize the negotiations between Giant and the Unions and state that the employees who will be "separated from the company on June 30, 2012 . . . will have the option to collect severance as specified . . . or elect to decline severance and be placed on the Recall list for (6) months." Local 922 MOU; <u>see also</u> Local 730 MOU (same). It thus does not matter that Giant "did not provide copies of the MOUs to the impacted associates." Pl. Resp. to JSOF, ¶ 86.

According to the company, the arrangement made sense in part because the six-month list was a component of its understanding with the <u>Unions</u> and was not actually a term of the Agreement itself. <u>See</u> Giant Reply at 8 (asserting that although the terms incorporated into the MOUs represent the agreement between the company and the Unions, "[t]he Separation and Release Agreements, in contrast, were solely between the individual Plaintiffs and Giant"). Indeed, the Unions themselves wanted to be responsible for informing their members about the Agreement, including its alternative. <u>See</u> Scott Dep. at 106:10-16 (explaining that Giant's senior management and the Unions decided, at the urging of the Unions, that it would be best if the

24

Unions notify Giant's employees of the 2012 lay-off, so that "the communication c[a]me from the Union to the associates"). Nothing in the record suggests that Giant directed the Unions to misrepresent to their members either the nature of the Agreement or the specifics of the negotiations, including the recall-list option.

In addition, while Plaintiffs insist that the Unions never informed them that signing the Agreement meant giving up recall rights, see Opp. at 43, any failure of the Unions to communicate details about their bargaining with Giant and the resulting accord cannot be an omission by Giant. A plaintiff typically cannot "make out a claim for rescission of a contract based on misrepresentation" under Maryland law if "Plaintiff's agent made the representation, not the opposing party." Hsue Tung v. Peters, No. 09-576, 2009 WL 5206627, at *3 (D. Md. 2009); cf. Chrysler Workers Ass'n v. Chrysler Corp., 834 F.2d 573, 578, 581-82 (6th Cir. 1987) (holding, in case where Plaintiffs argued that "they did not know their recall rights were extinguished" as result of an agreement between their employer and their union resulting in their transfer to new plants, that "[w]hether or not plaintiffs knew . . . of the terms of the preceding June letter agreement, it was a valid, reasonable and binding agreement entered into by [the company] and the plaintiffs' collective bargaining representative . . . . Plaintiffs undeniably had the opportunity to ask the Union about their status as [company] employees. There was no 'affirmative' act of concealment."). In short, inasmuch as Plaintiffs maintain that they did not understand that they had a choice between receiving severance pay upon termination or holding out for the possibility of being rehired, they never successfully connect that misunderstanding to a misrepresentation or omission by Giant.

### 3. *Misrepresentation re: Slim Chance of Recall*

The second material alleged misrepresentation is that Giant told Plaintiffs that, should they choose not to sign the Agreement, they would face only a slim chance of being recalled within the following six-month period. With regard to this issue, the dispute is not over whether Giant so told Plaintiffs, but whether such representation was false.

As a preliminary matter, it is difficult to discern from Plaintiffs' disjointed briefings precisely which representations made by Giant they believe were false. What is clear is that the employees are convinced that what they were told, prior to signing the Agreements, about the general "lack of work" for Union members was not correct. For instance, Plaintiff Foster testified that she was told the terminations were "due to the lack of work; it wasn't enough room in the warehouse for all of us . . . . And we really didn't have any option whether we could be laid off or not because it wasn't – it wasn't going to be enough work there for us." Foster Dep. at 91:20-92:4. But these statements were made by a representative of the Union, not by Giant. Plaintiff Coates, for his part, stated in his affidavit that he "never asked [Giant HR representative Kelli Hall] if there was a lack of work." Coates Affidavit at 5.

Plaintiffs most clearly explain what they believe to be Giant's misrepresentations in their NLRB Charges. There, they stated that

> [c]omplainants [Plaintiffs] and others were told that there would be no question and absolutely more future layoffs, that "Giant did not want them anymore," they had better sign the agreement, there was no more work for them to do, they should go look for other work, among other things.
>
> Reluctantly, the complainants signed the Giant severance agreement under the belief that there was no more work in the warehouses, there would be imminent future layoffs and that their jobs were gone forever.

> However, in or about August 14, 2012, (approximately 6 weeks later), the complainants learned that . . . there was no shortage of work at the Giant Jessup Warehouse where they had worked; . . . that Giant had hired back workers on July 1, 2012, the next day after complainants were laid off; . . . that Giant rehired at least 3 of the union workers who had secret conversations with union leaders back at the Jessup Warehouse and were secretly told not to sign the severance agreement.

NLRB Charges at 2-3.

Giant, however, maintains that its representations regarding the lack of future work for Plaintiffs were entirely accurate. Testimony from the company's leadership establishes that the layoffs were motivated by Giant's "reduced need for associates" in its recycling facilities as a result of the closure of the dry-goods facility formerly operated by C&S. See Scott Dep. at 58:10-15. In other words, Giant's consolidation of the fresh-foods recycling facility with the dry-goods recycling facility and the ensuing greater efficiency of its recycling operations meant that there were fewer jobs. The company, accordingly, decided to terminate twenty of its employees – including Plaintiffs. See Pounds Dep. at 45:19-46:16 (describing increased efficiencies as a result of facilities consolidation). Plaintiffs even admit that "evidence in the record shows that Giant over a period of more than 10 years has been trying to get out of the 'distribution' business and to simply operate its retail stores." Pl. Resp. to JSOF, ¶ 20. In sum, Plaintiffs have not pointed to evidence creating a jury question as to whether the company was correct − in its assessment at the time before the derecho struck − that Plaintiffs' jobs were no longer needed and that Giant would not need to recall workers to fill them.

Plaintiffs instead cite evidence that they believed there was plenty of work for them to do, implying that Giant must therefore have known that a recall would be likely or even inevitable. See Opp. at 48; Pl. Resp. to JSOF, ¶¶ 29-33. On that point, however, the Court concurs with Defendants that "[w]hether Plaintiffs believe that the Company's judgment concerning the

conduct of its operations was correct is wholly irrelevant." Giant Reply at 20. For if Plaintiffs simply had a different view as to the amount of work available at the Jessup facilities in June 2012, then what they posit is merely a difference of opinion, not a misrepresentation. Divergent opinions, of course, do not constitute misrepresentations and cannot form the basis for a rescission of an otherwise valid contract. See Hall, 94 A. at 531. No reasonable juror could conclude, from Plaintiffs' testimony, that Giant did not believe, at the time it signed the Agreements, that a recall was unlikely.

Giant admits that it did bring on board new recycling personnel – via recalls and new hires – after Plaintiffs were laid off. See Scott Dep. at 65-66. But it explains that these positions were motivated by the derecho of June 30, 2012, and caused Giant to lose power to more than seventy of its stores. See id. at 152:12-153:6-7 ("Every available refrigerated trailer [at the recycling facilities] needed to be cleaned or emptied and put into service as quickly as possible."). Before that storm, Giant maintains that it did not authorize the hiring of temporary workers to perform work that laid-off employees would have been performing. Id. at 156:11-157:11. Plaintiffs, for their part, dispute the derecho theory of the new hires, pointing to testimony of Plaintiffs Jackson, Cherry, and Christopher indicating that they did not notice that Giant's operations at the Jessup facility were affected after the storm. See, e.g., Pl. Exh. 16 (ECF No. 143-7) (Deposition of William Christopher) at 124:14-17 ("Q: Do you remember what was going on at work on the 30th of June 2012 as a result of the storm? A: Nothing. We was working."). But testimony that operations at Jessup were not affected right away is not inconsistent with Giant's statement that the power outages at its retail stores necessitated increased use of the refrigerated trailers stored in Jessup.

More important, Plaintiffs cite nothing in the record supporting their assumption that Giant used the derecho as an excuse to hire new employees to do the work that Plaintiffs had been doing before their termination.   In other words, Plaintiffs have offered neither argument nor evidence that this was a situation in which Giant misrepresented the amount of work it needed done in order to hire cheaper (*i.e.*, less senior or part-time) employees to perform work previously performed by Plaintiffs.   What is more, if this had been such a situation, it would be precisely the type of employer conduct to which Unions would typically object; here, however, the Unions had no quarrel with the Severance and Release Agreement and its terms.   And the crucial fact remains that Giant's July 2012 hires and rehires are not inconsistent with any representations it made or implied at the time Plaintiffs signed their Agreements regarding the slim chance of a future recall.   In short, Plaintiffs' proffers are insufficient for a jury to determine that a misrepresentation was made, as required for rescission of the Agreement.   See Parker v. Prudential Ins. Co. of Am., 900 F.2d 772, 777 (4th Cir. 1990).

In Plaintiffs' Opposition, they also seem to argue that Giant misrepresented to them in April 2012 that they were not at risk of termination, notwithstanding layoffs occurring elsewhere in the company; then, only months later, Plaintiffs were, in fact, laid off.   See Opp. at 43.   But for purposes of the Agreement, representations made in April 2012 are irrelevant, as they had no connection with the severance packages.   First, "[i]t is undisputed that they [Plaintiffs] would have been laid-off whether they signed the Separation Agreements or not.   The Agreements simply provided money in exchange for a release of claims."   Giant Reply at 15.   Second, only the representations Giant made in June 2012, when Giant presented the Separation Agreements to Plaintiffs and when Plaintiffs agreed to sign them, are relevant for purposes of a claim for rescission of the Agreement.   Plaintiffs could not justifiably rely on representations about Giant's

termination decisions that the company made in April where they differ from those made on the same issue in June, at the time Plaintiffs were considering whether to sign the Agreements. See Ryan v. Brady, 366 A.2d 745, 750 (Md. Ct. Spec. App. 1976) ("It is well established in Maryland that to be entitled to this somewhat extraordinary relief [of rescission of a contract] there must be proof of justifiable reliance on a material misrepresentation.") (citing Chesapeake Homes, Inc., 240 A.2d at 249); see also McCormick & Co. v. Childers, 468 F.2d 757, 766 (4th Cir. 1972) (noting, where plaintiff sought to rescind contract based on material misrepresentation, pursuant to Maryland law, that "[i]t is most important to ascertain, in the first place, whether the statement was such that the party was justified in relying upon it, or was such, on the other hand, that he was bound to inquire and examine into its correctness himself.  In respect to this alternative, there is a broad distinction between statements of fact which really form a part of, or are essentially connected with, the substance of the transaction, and representations which are mere expressions of opinion, hope, or expectations, or are mere general commendations.") (quotation marks and citation omitted).

Ultimately, then, no reasonable juror could find that Giant misrepresented the situation that, at the time the Agreements were signed by the parties, there was not a strong likelihood that it would need to recall terminated employees within six months.  Rather than being misled by Giant, Plaintiffs seem to be experiencing a classic case of buyer's remorse, but "[n]either a party's subsequent dissatisfaction with a contract, nor a party's failure to read a contract are adequate reasons for rescission of a contract." Hsue Tung, 2009 WL 5206627, at *3.  In fact, much of Giant's conduct leading up to the signing of the Agreements – the effects bargaining with Union representatives, the group and individual meetings with Plaintiffs to explain the Agreements, the 45-day period to review the Agreements, the 7-day revocation period, the

encouragement that Plaintiffs have a lawyer examine the Agreement, and the plain language of the Agreement itself – reflects a good-faith attempt to give Plaintiffs a fair opportunity to consider the terms of the severance package. If Plaintiffs, despite these efforts, still labored under misunderstandings about the nature and effects of the Agreement, such misunderstandings are a unilateral mistake, not one induced by a misrepresentation. And under Maryland law, "a unilateral mistake is ordinarily not a ground for relief from a contract." Creamer v. Helferstay, 448 A.2d 332 (Md. 1982); see also Hsue Tung, 2009 WL 5206627, at *4 (where a party to a contract asserts a "misunderstanding of the contract and [a] view that his attorney" or other representative "made a mistake in signing" or encouraging him to sign "the agreement," such assertions "are all unilateral mistakes and thus do not provide ground for rescission of the contract."). Plaintiffs have thus failed to establish a dispute of fact from which a jury could conclude that Giant induced them to sign the Agreements through material misrepresentations.

4.  *ADEA*

For the first time in their Opposition, Plaintiffs argue that the waiver in the Agreements somehow violated the Age Discrimination in Employment Act. See Opp. at 50-51. They concede that the Agreement lists the ADEA as one of the statutes under which Plaintiffs' claims against Giant are waived, but they argue that the ADEA requires that a waiver of rights be knowing and voluntary and sets forth guidelines for how such voluntariness may be assessed. See id. at 51; see also 29 U.S.C. 626(f)(1). Because four of the Plaintiffs – Mathis, Ward, Christopher, and Foster – are over the age of forty, Plaintiffs believe they are covered by the ADEA and did not knowingly and voluntarily waive their ADEA rights.

This argument seems to misunderstand Giant's position entirely. To begin, Plaintiffs themselves acknowledge that they did not allege any claims under the ADEA in their Amended

Complaint.  See Opp. at 51 n.7.  Giant argues simply that the release provision covers the claims that Plaintiffs did plead – viz., their hybrid section-301/fair-representation claim.  It takes no position as to the applicability of the Agreement's waiver provision as to any claims Plaintiffs did not plead – including any they might have under the ADEA.  Nor need the Court address that issue, for the question of whether the Agreement complies with the requirements of the ADEA is irrelevant in a case where the Complaint does not state such a claim.

     5.  *Failure to Revoke*

As a final point, Giant correctly underscores that even if it did misrepresent facts material to the Agreement, Plaintiffs are still not entitled to rescission.  Maryland law requires that parties seeking rescission of a contract as a result of a misrepresentation invoke such a remedy or otherwise attempt to revoke the contract "promptly . . . once a party discovers facts which justify it." Cutler v. Sugarman Org., Ltd., 596 A.2d 105, 110 (Md. Ct. Spec. App. 1991) (quotation marks and citation omitted); see also Finch v. Hughes Aircraft Co., 469 A.2d 867 (Md. 1984) ("A plaintiff seeking rescission must demonstrate that he acted promptly after discovery of the ground for rescission.").  Maryland courts have held that "[r]escission requires at a minimum that a party exercising a right to rescind notify the other party and demonstrate an unconditional willingness to return to the other party both the consideration that was given and any benefits received." Cutler, 596 A.2d at 111.  Should a party seeking rescission fail to "exercise [the right to rescission] within a reasonable time, which is determined, in large part, by whether the period has been long enough to result in prejudice," id., a court many deny the relief sought.  Further, "Maryland decisions" have found that "there was a waiver of the right to rescind . . . on the basis of an affirmative act of ratification of the contract or some other act which evidences an intent to benefit from the transaction or which renders restoring the parties to their original position

impossible or difficult." Merritt v. Craig, 746 A.2d 923, 928 (Md. Ct. Spec. App. 2000); cf. Benjamin v. Erk, 771 A.2d 1106, 1120 (Md. Ct. Spec. App. 2001) ("Within days of discovering the alleged fraud, appellees demanded rescission, asking to withdraw from the transaction.").

Here, Plaintiffs filed their Group Grievances in August of 2012, not long after the Agreements were signed at the end of June. As Giant notes, however, "no Plaintiff has ever revoked, or attempted to revoke, their Separation Agreement." Giant Reply at 15 (citing Def. JSOF, ¶¶ 114-116). Plaintiffs assert, without citing to any specific record evidence, that "some Plaintiffs testified and/or offered during their depositions to return the money to get their jobs back [via a recall] and that had Giant offered them jobs back they would have gladly returned the money." Pl. Resp. to JSOF ¶ 116. Crucially, they do not contend that they made any actual attempts to revoke the Agreement at any point before this litigation.

Plaintiffs admit, furthermore, that "they did receive their separation payments." Id., ¶ 115. To the best of the Court's knowledge, all Plaintiffs retained such payments, without ever attempting to repay Giant in exchange for being placed on a six-month recall list. See, e.g., Def. Exh. 6 (ECF No. 131-6) (Deposition of Donna Ward) at 125:18-20 ("Q: At any time did you return that money to the company? A: No sir."). And while some Plaintiffs indicated that they would have liked to trade the severance pay they received for a recalled position with Giant, see Def. Exh. 5 (ECF No. 131-5) (Deposition of Ralph Jackson) at 100:7-10, that suggestion hardly constitutes an actual attempt at revocation. That Plaintiffs would have been amenable to revocation does not mean that they took affirmative steps to revoke the Agreement. Nor would the trade they describe be a true revocation of the Agreement, since Plaintiffs would only have been placed on a recall list had they not signed the Agreement; they would not have been recalled as a direct result of revocation. In sum, Plaintiffs did not properly satisfy the prompt-

revocation element of a claim for rescission under Maryland law. This, therefore, is an alternative ground on which Giant prevails.

* * *

As Plaintiffs have failed to establish that a material misrepresentation by Giant induced them to sign the Agreements, the Court must conclude that they are binding on Plaintiffs – including the provision releasing Giant from any claims related to their employment or termination. Based on the undisputed material facts, the Court finds that Plaintiffs have waived the claims they now seek to assert against Giant. The company, therefore, is entitled to judgment as a matter of law, and the Court will grant its Motion.

B.     Hybrid Claim Against Unions

Although the Agreement's waiver provision releases Giant from any claims Plaintiffs might have had against the company, it has no effect on whether they may sue the Unions. This is because the Agreement's "Complete Release of Claims" provision only states that signatories release

> the Company, all affiliated or related companies or subsidiaries, their parents, predecessors, successors, and affiliates (including but not limited to Giant of Maryland LLC, Giant Food LLC, Ahold USA, Inc., and Koninklijke Ahold N.V.), and with respect to each entity, all of its shareholders, directors, officers, agents, attorneys, employees, representatives, assigns and owners, whether past, present, or future (collectively, the "Released Parties").

Agreement, ¶ 3. As the Unions are clearly not among the "Released Parties," the Court next moves to the merits of the claim against those Defendants.

By way of reminder, Plaintiffs' only remaining cause of action against the Unions – the hybrid section-301/fair-representation claim – requires them to prove both that Giant breached the CBAs by terminating Plaintiffs in June of 2012 and that the Unions breached their duty of

fair representation when they negotiated the termination and severance agreements with the company. The Supreme Court has explained that "to prevail against either the company or the Union" in a hybrid claim, "employee-plaintiffs must not only show that their discharge was contrary to the [CBA] but must also carry the burden of demonstrating a breach of duty by the Union. . . . The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both." DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983) (alteration, quotation marks, and citation omitted).

In this case, the Court ultimately concludes that Plaintiffs cannot prevail on their hybrid claim against the Unions because the undisputed material facts show that Giant did not breach the CBAs; it thus need not consider the fair-representation issue. See Burnett v. Wash. Metro. Area Transit Auth., 139 F. Supp. 3d 231, 236 (D.D.C. 2015) ("[T]he absence of a genuine question of material fact in the defendants' favor on either prong is fatal to [Plaintiffs'] entire [hybrid] claim."). It bears noting that this merits determination – viz., that Plaintiffs have failed to establish half of their hybrid claim – also serves as a separate basis to grant Giant's Motion. For even in the absence of any waiver, Plaintiffs cannot prevail against Giant on a hybrid claim where they cannot satisfy one of its two prongs.

To establish the CBA-breach component of their hybrid claim, Plaintiffs assert that Giant violated its CBAs with the Unions by (1) terminating Plaintiffs "when there was work to perform"; (2) conducting layoffs without regard to seniority; (3) recalling former employees without regard to seniority; (4) failing to recall Plaintiffs or put them on notice of such recall; (5) authorizing supervisors to perform Union members' work; and (6) authorizing non-Union workers to perform Union members' work. See Opp. 66-71. The Court examines each of these alleged breaches separately.

As to the first, the Court has already explained that there is no material dispute that Giant's decision to terminate Plaintiffs was, in fact, the result of a decrease in work. Plaintiffs do not disagree – nor could they – that Giant "retained the entrepreneurial right to consolidate its recycling operations and lay off the employees as a result of the expected gained efficiencies," notwithstanding the CBAs. See Giant Reply at 18; see also First Nat'l Maintenance Corp v. NLRB, 452 U.S. 666, 686 (1981) (NLRA does not require employer to bargain with union "in deciding whether to shut down part of its business purely for economic reasons"). Indeed, none of the provisions of the CBAs cited by Plaintiffs suggests that Giant was somehow bound not to consolidate recycling facilities and terminate redundant employees, nor do they set forth guidelines for such terminations. Compare Opp. at 66-67 (arguing that "Giant breached Articles VII, X, XIV of Local 922's CBA and Articles 1, 15, 15.3F, [15.3]G(3), 22 of Local 730's CBA in calling a layoff due to lack of work") with Def. Exh. 11 (ECF No. 132-1) (Local 922 CBA) at 5 (Article VII, "Seniority"), 9 (Article X, "Grievances and Arbitration"), 10 (Article XIV, "Work Week and Overtime"); and Def. Exh. 10 (ECF No. 131-10) (Local 730 CBA) at 4 (Article 1, "Supervisory Personnel"), 11-12 (Articles 15, 15.3F, 15.3G(3), "Seniority"), 16 (Article 22, "Grievances and Arbitration"). Giant thus did not breach the CBAs by laying off workers as result of the consolidation of its facilities.

Nor did the company violate the CBAs by conducting layoffs without regard to seniority, belying Plaintiffs' second asserted breach. To be sure, both CBAs require that seniority play a role in determining layoffs. See Local 730 CBA at 11-12 (Article 15.3A, "Seniority alone will govern in layoffs . . . provided the employee with seniority is capable of fully performing the job"); see also Local 922 CBA at 5 (Article VII.2, "The principle of seniority shall apply in all cases of decrease or increase of the working forces, provided the employees have the ability to

36

do the work in a satisfactory manner"). The only evidence Plaintiffs marshal in support of their claim that Giant breached these provisions, however, is an inconclusive suggestion that Curtis Pumphrey, a member of Local 730 but not a Plaintiff, should not have been laid off when Gloria Royster, over whom he purportedly had seniority, was allowed to keep her job. See Opp. at 67-68. Given that Pumphrey is not a Plaintiff and that Plaintiffs themselves are unsure of his seniority date, see id. at 68, this is hardly enough to create a factual dispute as to Giant's conduct, particularly where there is countervailing evidence that Giant did comply with the seniority rules. Cf. Pl. Exh. 62 (ECF No. 145-12) ("Job Titles and Ages of Giant Recycling Facility Employees Selected for Separation") at 1 (noting that employees listed "were considered for separation pursuant to the number of positions available and the seniority process established in the Collective Bargaining Agreements between Local 730-4, Local 922 and the Company"). These are hardly "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Skipping the third allegation for the moment, Plaintiffs' fourth point that Giant's "failure" to recall them breached the CBAs is similarly dead on arrival. There is no dispute, as the foregoing analysis elucidates, that they opted out of any rights to rehire that they might have had under the CBAs by signing their Separation and Release Agreements and accepting severance payment instead. For the same reason, Plaintiffs' assertion that Giant never notified them of a recall occurring after their termination and their decision to opt out of the recall list is equally unavailing.

Plaintiffs' remaining three asserted breaches of the CBA – which they number (3), (5), and (6) – all fail because they were not included in their Group Grievance. The Grievance claimed that Giant "illegally and wrongfully terminated and discharged" Plaintiffs "under false

pretenses . . . and misrepresentations that allegedly there was no more work . . . , that the company was getting ready to have more lay-offs, that there was no room or work space," and alleged that "Giant also violated the contract/CBA and other laws through deceit and fraudulently inducing these . . . former Giant employees into wrongfully waiving their rights, privileges and claims against it under false pretenses." Def. Exh. 41 (ECF No. 134-1) (Aug. 16, 2012, Group Grievance) at 3.  No grievance about seniority-based recalls or authorizing supervisors or non-Union members to perform work appears.

As the Supreme Court has explained: "It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement. Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement." DelCostello, 462 U.S. at 163 (internal citations omitted); see also Daigle v. Gulf State Utils. Co., Local Union No. 2286, 794 F.2d 974, 977 (5th Cir. 1986) ("If the arbitration and grievance procedure is the exclusive and final remedy for breach of the collective bargaining agreement, the employee may not sue his employer under § 301 until he has exhausted the procedure.").

An exception may exist where "the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." DelCostello, 462 U.S. at 164.  That is not the case here.  While Plaintiffs may believe the Unions did not sufficiently prosecute the Grievance actually filed, they offer no evidence or argument that the Unions improperly failed to include in such Grievance the three aforementioned issues.  Once again, the heart of their Grievance (and this suit) relates to their termination, not about who performed Union-members' work.

38

In sum, none of Plaintiffs' allegations concerning Giant's purported breach of the CBAs leaves the starting gate, thus hobbling their ability to put their hybrid claim in the running against the Unions – or, for that matter, against Giant. As the employees are unable to establish one of the requisite halves of their claim against the Unions, the Court will grant those Defendants' Motions for Summary Judgment as well.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Giant, Local 922, and Local 730's separate Motions for Summary Judgment and enter judgment in Defendants' favor. A contemporaneous Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: September 1, 2016